UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA     )
                             )
          v.                 )     Case No. 2:24-cr-78-1
                             )
BOUNTHAVONG SONTHIKOUMMANE,  )
     Defendant.              )

## OPINION AND ORDER

Defendant Bounthavong Sonthikoummane has been charged with violating 18 U.S.C. § 922(g)(3). The government alleges that Mr. Sonthikoummane knowingly possessed seven firearms and ammunition while an unlawful user of and addicted to controlled substances, in violation of § 922(g)(3). ECF No. 1. Pending before the Court is Defendant's motion to suppress certain statements Defendant made while in custody regarding firearms in his home and his use of a controlled substance. ECF No. 24 at 14. The Court held a suppression hearing on March 20, 2025, and heard testimony from three law enforcement officers who participated in the Defendant's arrest and questioning. For the reasons set forth below, Defendant's motion is **granted in part and denied in part**.

## Background

On June 12, 2024, a federal grand jury in Vermont returned an indictment against the Defendant, charging him with false statements, conspiracy, wire fraud, and money laundering, related to events in 2020 and 2021. ECF No. 14 at 1-2. The grand

jury also indicted Defendant's girlfriend[1], Ashlyn Arcouette, with the same excepting the false statements. *Id.* Sealed arrest warrants were issued for both.

The following day, June 13, 2024, law enforcement agents from multiple agencies went to the Defendant and Ms. Arcouette's home in White River Junction, intending to arrest both. *Id.* at 2. The agents did not have a search warrant for the home.

FBI Special Agent Antoine Waithe was the lead case agent for the investigation that led to the aforementioned warrants. Agent Waithe also developed the plan for executing the arrest warrants and led the multi-agency team on June 13. *Id.* Per Agent Waithe's testimony at the suppression hearing, the plan following arrest was to bring the Defendant to the local Hartford, Vermont police department, "then go through the regular procedure, and then once he's removed to bring Ashlyn also to the PD with separate transport, and then as soon as [he] could, would be to meet with [Defendant], do the *Miranda*, and then attempt an interview." *See also* ECF No. 19 at 2-3. Agent Waithe planned to follow essentially the same process with Ms. Arcouette "concurrently," or at least beginning once the Defendant had been "removed" from the scene of the arrest, i.e. his home.

---

[1] Parties variously refer to Ms. Arcouette as the Defendant's "partner" or "girlfriend." Determination of this distinction, if any, is not before the Court.

Two factors complicated the arrest and interrogation plan. The first was the discovery that Mr. Sonthikoummane and Ms. Arcouette had two five-month-old infants in their care at their home. Agent Waithe had previously seen "some social media mention in a part of the case that there was a baby registry at some time," according to his testimony. However, Agent Waithe testified that, not having seen other corroboratory information, he was not anticipating the presence of the infants. The second was the discovery of a firearm by Customs and Border Protection Agent James Pollard.

The timing and sequence of events on June 13 are important to resolution of the motion, and both counsel for the defense and Agent Waithe have prepared timelines. ECF Nos. 24, 24-1.

The team executing the arrest warrant was comprised of members of the FBI, led by Agent Waithe, and members of the Hartford Police Department. ECF No. 24-1 at 3. The team began the day with a briefing at the Hartford Police Department at 7:00 a.m.

At that 7:00 a.m. briefing, some members of the team, including Agents Waithe and Kirwan, learned from a Hartford PD detective, apparently for the first time, that the Drug Enforcement Administration (DEA) had interest in the house and its occupants and had at one point had a pole camera set up outside the house. At the March 20, 2025, suppression hearing,

3

Agent Kirwan indicated he thought the Defendant "was under investigation at one point" by the DEA but that he "believe[d the DEA] ended the investigation" before June 13. At the suppression hearing, Agent Waithe testified that while he was initially unaware of the DEA investigation, he assented to a local police officer informing the DEA that they were executing the arrest warrants that day. Hartford PD Detective Lieutenant Thomas Howell was "advised of DEA interest prior to OP," per a personnel list prepared by Agent Waithe. ECF No. 24-1 at 3. It is not clear if Lt. Howell was in fact the one who informed the FBI agents at the briefing of the DEA investigation. The DEA ultimately appeared and attempted to search the Defendant's house and interview the Defendant at the police station later in the day.

While Agent Waithe may not have known about the DEA investigation before that 7 a.m. briefing on the day of arrest, he did have some knowledge of the Defendant's past troubles with the law. In the course of his investigation, Agent Waithe found that the Defendant "along with his brothers, were likely engaged in drug trafficking for a long period of time and that there was some drug use in [Defendant's] previous history," according to his testimony at the suppression hearing. Agent Waithe was also aware of the Defendant's past arrests and charges for violent crimes. However, Agent Waithe testified that prior to the

4

arrest, he did not have enough information "to determine whether or not [Defendant] was a prohibited . . . possessor."

By around 8:22 a.m., the Defendant had voluntarily exited his home, was handcuffed, and was taken into custody in a patrol car. ECF No. 24 at 2. He was not given a *Miranda* warning when he was taken into custody. The Defendant would remain in custody in the patrol car parked near the house until approximately 8:53 a.m. when a HPD Officer began transporting him to the police department. ECF No. 24-1 at 1.

At around 8:26 a.m., Ms. Arcouette exited the house carrying her two infants. Agent Waithe informed her that he would "need to get" some additional clothing for the Defendant from inside the house. ECF No. 24 at 2. Agent Waithe further informed Ms. Arcouette that officers would need to accompany Ms. Arcouette into the house and "take a quick peek in the rooms, just for our own safety." *Id.* Four officers, including Agent Waithe, accompanied Ms. Arcouette into the house over the next few minutes as she obtained items for the Defendant. At approximately 8:35 a.m., Agent Waithe declared the scene secure and directed the FBI agents to turn off their body cameras.[2] *Id.* at 2.

---

[2] Agent Waithe testified that his "understanding of our FBI policy is that once the scene is deemed safe and secure, the team leader directs the deactivation of the body cameras." HPD body cameras, as well as cameras on cars and in the police station, captured footage after 8:35 a.m.

According to his testimony at the suppression hearing, within the next few minutes, by 8:40 a.m., Customs and Border Protection Agent James Pollard who had remained in the living room of the house "noticed that bookcase and [he] could see what looked to be like the grip of a handgun on the bookcase." Agent Pollard promptly exited the house and notified other members of the team that he had found a firearm. After obtaining gloves, Agent Pollard and Agent Kirwan re-entered the house. Agent Pollard testified that he removed the magazine and ensured the chamber was clear "just to render it safe so it wasn't a potential threat to any officers" and left it in place on the bookshelf. Agent Waithe then took pictures of the firearm to run criminal checks on it.

At 8:44 a.m., Agent Waithe placed two calls. The first was to an Assistant United States Attorney. ECF No. 24-1 at 1. The second was to Lt. Howell, who had remained at the police station. At 8:51 a.m., Agent Waithe sent Lt. Howell pictures of the handgun to run criminal checks. ECF No. 24 at 3.

Nearly simultaneously, beginning at approximately 8:43 a.m., Agent Kirwan initiated a conversation about the discovery of the firearm with HPD officers:

> **Agent Kirwan**: As far as you're aware, are they prohibited from owning firearms? Are they?
>
> **Sgt. Moody**: I mean, is there anything to do something with drug using? Drug user in possession?

6

**Agent Kirwan:** She's overdosed a couple times.

**Sgt. Moody:** Do you have enough to temporarily do like 924(c) or something? I don't know what his criminal record is. Like I haven't seen anything. He's got a home invasion and an ag assault. I assume he's a felon in possession but . . . State charges are a little difficult.

**Agent Kirwan:** Can you just charge that? Rather than . . .

**Sgt. Moody:** Yeah, I don't. Like I think if you get him to even say, you know like, yeah, one of them smokes marijuana.

**Agent Kirwan:** I used to . . .

**Sgt. Moody:** Well, right, you know what I mean . . .

**Agent Kirwan:** Yeah, I gotcha.

ECF No. 24 at 3.

During a short break in the conversation, Agent Kirwan informed Agent Waithe about the discovery of the firearm and told him that Ms. Arcouette was claiming that the firearm belongs to the Defendant. Defendant Exhibit H, BodyCam_102 at 9:44:30 a.m. The conversation with Sgt. Moody continued:

**Sgt. Scott Moody:** No sign of drug use or anything?

**Agent Kirwan:** What's that?

**Sgt. Scott Moody:** Did you see any sign of drug use at all.

**Agent Kirwan:** [shaking his head "no"] Surprising to me.

ECF No. 24 at 3. At 8:51 a.m., the Defendant was driven away from the house to the police station.

At 8:57 a.m., still inside the house, Agent Waithe informed Ms. Arcouette for the first time that there was a warrant for her arrest. ECF No. 24-1 at 1. As noted above, the plan had been

to immediately transport Ms. Arcouette to the station after the
Defendant departed the scene. But Agent Waithe testified that
the presence of the infants prompted alternate arrangements on
"humanitarian grounds." For the next 13 minutes, Agent Waithe
and Ms. Arcouette attempted to coordinate the possibility and
logistics of her surrender at a later time to account for
childcare. At around 9:10 a.m., Agent Waithe gave Ms. Arcouette
a *Miranda* warning, and she invoked her *Miranda* rights, according
to Agent Waithe's testimony and contemporaneous body camera
footage.

However, that invocation did not end the conversation
between Agent Waithe and Ms. Arcouette, nor did Agent Waithe or
other officers exit the house immediately. Agent Waithe and Ms.
Arcouette continued to speak about the logistics of Ms.
Arcouette's self-surrender and the firearm(s) for at least the
next hour and a half. At approximately 9:14, three minutes after
Ms. Arcouette invoked her *Miranda* rights, Agent Waithe told Ms.
Arcouette that he was "trying to figure out who owns" the
recently discovered firearm. Defendant Exhibit A, BodyCam_172.
Agent Waithe testified at the suppression hearing that his
"intent was to figure out the status of the weapons because we
were trying to figure out whether there were any criminal hits
on the weapons we'd encountered."

8

Beginning at approximately 9:22 a.m., Agent Waithe spoke on the phone with Lt. Howell and also with Agent Kirwan who had returned to the station. ECF No. 24-1 at 1.  There does not appear to be a recording available of this call, but Agent Waithe testified, "I asked Agent Kirwan to extend the offer of self-surrendering the weapons for temporary safekeeping at the PD because I thought that was best for the safety of the household and also from a public safety perspective."

Immediately after speaking with Agent Waithe, at around 9:26 a.m., Agent Kirwan entered an interview room in the police station where the Defendant sat with one hand handcuffed to a bar on the wall. Agent Kirwan initiated conversation with the Defendant. He informed the Defendant that law enforcement had discovered a firearm in the house in plain view, and he first asked the Defendant whether there were any other firearms in the house. The Defendant responded that there were more. Then Agent Kirwan asked who the firearms belonged to. The Defendant responded that the firearms belonged to him, and he had obtained them on Snapchat. Agent Kirwan then told the Defendant about the offer to store the firearms as a potential condition of release, which the Defendant declined. These statements are, in part, the subject of Defendant's motion. The Defendant had not at this point in the morning been given a *Miranda* warning.

Agent Kirwan relayed the Defendant's responses to Agent
Waithe, back at the house. ECF No. 24 at 4. Agent Waithe, in
turn, relayed to Ms. Arcouette that the Defendant had said there
were more weapons in the house. *Id.* The Court understands that
the Defendant is not moving to suppress evidence of any firearms
found following these conversations. Therefore, it is enough to
state that in short order the officers found several additional
firearms in various rooms of the house.

Approximately 35 minutes later, at 10:04 a.m., the
Defendant began dry-heaving and spitting up, while still
shackled in the interview room. ECF No. 23 at 6; Government
Exhibit 1, Interview Room footage at 10:04:30. The Defendant
continued dry-heaving and spitting up until approximately
10:06:30, and he used a roll of toilet paper provided earlier by
the officers to wipe up any spit. Government Exhibit 1,
Interview Room footage at 10:06:30. At 10:06:41, Lt. Howell
opened the interview room door. It is unclear from the record
whether Lt. Howell was aware the Defendant had been ill before
opening the door, as Lt. Howell stopped speaking mid-sentence to
inquire as to the Defendant's well-being: "Hey bud, we're going
to put you – how, are you okay?" *Id.*

Over the next minute, Lt. Howell asked the Defendant a
series of questions about why he is ill, alternating between
asking whether it may be traced to food or to drugs. Lt. Howell

10

first asked whether it was something the Defendant ate. Then he
asked, "No drugs?" to which the Defendants said no. Lt. Howell
also asked whether the Defendant would like the fire department[3]
to check on him. At first the Defendant said he did not know.
Lt. Howell again asked about food before asking, "Ok. Did you
take any drugs?" When the Defendant replied no, Lt. Howell again
asked, "Nothing?" Following another no, Lt. Howell, asks again,
"No dope, no meth, no nothing, no crack?" After the Defendant
again replies no, Lt. Howell said, "I don't really care about –
I I don't want you to have taken something and then you're
overdosing in the cell. Okay?" After those questions about drug
use, Lt. Howell asked again whether the Defendant wanted the
fire department to come take a look at him, and the Defendant
responded affirmatively. Lt. Howell said they would first
transfer him to a cell, and the fire department would see him
there. At approximately 10:08:15 a.m., the Defendant departed
the interview room and was moved to a holding cell.

Within a minute, the Defendant was relocated to the
holding cell, where his hands were cuffed to a band around his
waist. Lt. Howell continued asking him about the cause of his
illness. Lt. Howell told the Defendant that the firefighters
were going to come take a look at him, and that "if you took

---

[3] The Hartford Fire Department and Hartford Police Department share an
address. *See* https://hartford-vt.org/2440/Fire-Department;
https://www.hartford-vt.org/3689/Police-Department.

something just tell 'em. . . . If you need help, I want you to
get help. I don't want you to feel like you're sick. Just be
honest with those guys okay?" *Id.* at 10:10. Lt. Howell left the
cell, locking it behind him, and the Defendant rested on a
bench.

A minute and a half later, Lt. Howell returned to the
holding room area and held an entry door open for the arriving
EMTs. Defendant Exhibit I, Outside Holding footage at 10:11:45.
As he did so, Lt. Howell began asking the Defendant questions
through the locked door of his holding cell:

**Lt. Howell:** Hey, are you dope sick?
**Defendant:** No.
**Lt. Howell:** Are you dope sick at all?
**Defendant:** I might be.
**Lt. Howell:** You might be. Ok, all right.
**Defendant:** Hey wait. Not to tell my girl. I just feel
embarrassed. Don't tell my girl ok. I just feel bad. Don't
tell my girl.
**Lt. Howell:** That's not their . . . that's not their
business. You just, will you tell these guys when the last
time you used so they know what's going on? Ok? When was
the last time?
**Defendant:** Five in the morning.
**Lt. Howell:** Five in the morning you used? What did you use?
**Defendant:** Heroin.
**Lt. Howell:** Heroin?
**Defendant:** Yep.

Defendant Exhibit B, Holding footage at 10:11:45; ECF No. 24 at
6.

Immediately after this conversation ended, the EMTs arrived
at the cell door. Defendant Exhibit I, Outside Holding footage
at 10:12:20. However, Lt. Howell walked away from the door and
presumably placed a phone call. Another officer, after failing
to open the door, had to retrieve Lt. Howell, who reappeared
while on the phone and provided assistance unlocking the door.
The EMTs entered the cell, and an EMT asked the Defendant what
was going on, so the Defendant repeated that he is "dope sick"
and last used at five in the morning. In response to further
questions, the Defendant provided further details about the
frequency and method of his use of heroin. Two officers remained
in the holding room entry area, with the door open, observing
the situation and engaging with the EMTs and the Defendant. *Id.;*
ECF No. 24 at 6. The Defendant's responses to the questioning
from Lt. Howell, as well as his responses to the EMTs that
immediately followed his interaction with Lt. Howell, are the
subject of the second part of Defendant's motion to suppress.

The Defendant received a *Miranda* warning for the first time
on June 13 around 1:12 p.m., from Agent Waithe. ECF No. 24 at 6.
After receiving the warning, the Defendant invoked his rights.

At 1:21 p.m., Agent Waithe told the Defendant, "We're aware
that you've been involved in drugs in the past, and we believe

that you're still involved in drugs now." Agent Waithe informed
the Defendant that an agent with the DEA waiting outside would
like to question him separately from the fraud case for which he
had been arrested, and Defendant again invoked his right to
counsel. A few minutes later, Agent Waithe informed the
Defendant that the officers had seized the firearms "in plain
view" at the house "because you've been using."

### Discussion

Convictions under 18 U.S.C. § 922(g)(3) often require the
government to establish, *inter alia*, two key facts: (1) that a
person "is an unlawful user of or addicted to any controlled
substance (as defined in section 102 of the Controlled
Substances Act (21 U.S.C 802));" and (2) that the person
"possess[es] in or affecting commerce, any firearm or
ammunition." When law enforcement officers arrived at the
Defendant's house on the morning of June 13, 2024, to execute
arrest warrants for white collar crimes, by all accounts they
did not know either fact to be true about the Defendant. But
within approximately an hour and a half of being arrested and
taken into custody, the Defendant told the officers and EMTs
that (1) he used heroin, a controlled substance, earlier that
morning, and (2) he owned firearms. The Defendant now moves to
suppress those statements.

14

The Defendant argues that his statements about heroin use and firearm ownership should not be admissible since they were the product of a custodial interrogation in the absence of a *Miranda* warning. *Miranda v. Arizona* held that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation." 384 U.S. 436, 471 (1966).

There is no doubt that the Defendant was in custody at the time of the statements. The questions before this Court are whether the conversations in which the Defendant made these statements should be properly considered interrogations and, if so, whether an exception still permits their admission. Given "the inherently coercive nature of custodial interrogation," *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011), "courts place upon the government the burden to prove that a defendant's confession was voluntary." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010).

The Court first considers the Defendant's acknowledgement of firearm ownership and finds that the conversation constituted an interrogation and that the "public safety" exception proposed

15

by the government is applicable in part and inapplicable in part. The Court then considers the Defendant's acknowledgement of heroin use and finds that those conversations also constitute interrogations, and no exception applies.

## I.    Statements related to firearm ownership

The Defendant moves to suppress his statements made to Agent Kirwan regarding his ownership of firearms at his home. At the time of those statements, the Defendant was in custody, shackled to a wall in a police station holding cell. The Defendant argues that the conversation between the Defendant and Agent Kirwan constituted an interrogation, conducted without a *Miranda* warning. The government argues that the conversation was not an interrogation because "the purpose was to ascertain whether Sonthikoummane would voluntarily agree to surrender the weapon," or, in the alternative, that if it was an interrogation, the public safety exception applies. ECF No. 19 at 3-4.

Both parties point to *Rhode Island v. Innis*, 446 U.S. 291 (1980), to define an interrogation. The Supreme Court defined "interrogation" to "refer[] not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at

16

301. The Court clarified that an "incriminating response" includes not just "direct confessions" but also "statements which amount to admissions of part or all of an offense." *Id.* at 301 n.5 (quoting *Miranda*, 384 U.S. at 476-77) (internal quotation omitted). However, not every question from law enforcement automatically constitutes an interrogation, because "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 302.

In this case, Agent Kirwan asked the Defendant whether he owned a firearm discovered at his home and whether there were any other firearms present. The government argues that the purpose of those questions was not to establish ownership of the firearms but instead to facilitate a potential voluntary surrender of the firearms, should the Defendant so desire. This characterization is strongly disputed by the Defendant. However, whether or not that was the primary purpose of the question, the agent should have known that an affirmative response to the question of ownership would constitute an admission to part of an offense which Agent Kirwan suspected the Defendant may have committed: firearm possession by a prohibited person. Therefore, the interaction constituted an interrogation.

17

The Defendant has presented evidence that law enforcement was in the process of establishing a case against him for unlawful possession of the firearm. As established above, at 8:43 a.m., Agent Kirwan initiated a conversation with other officers about whether they had enough evidence to show that the Defendant was a prohibited possessor. At the time, the officers had heard from the Defendant's girlfriend that the recently discovered firearm belonged to him, but a direct admission from the Defendant would of course be stronger evidence. At 9:26 a.m., Agent Kirwan obtained that admission during a custodial interrogation.

The government has argued in the alternative that the "public safety exception" established by *New York v. Quarles*, 467 U.S. 649 (1984), should excuse any *Miranda*-free custodial interrogation about firearms. "Under this exception, overriding considerations of public safety may justify an officer's failure to provide *Miranda* warnings before he asks questions devoted to locating an abandoned weapon." *United States v. Ferguson*, 702 F.3d 89, 93 (2d Cir. 2012) (quoting *Quarles*, 467 U.S. at 651) (cleaned up). In this circuit, the exception has been developed most thoroughly in *United States v. Estrada*, 430 F.3d 606 (2d Cir. 2005), and *United States v. Ferguson*.

The *Estrada* and *Ferguson* courts have emphasized that there is no template for facts that fit within the exception, so the

Court is expected to "examin[e] the totality of the circumstances in a given case." *Ferguson,* 702 F.3d at 96 (quoting *Estrada*, 430 F.3d at 616). Within that analysis, the circuit court has identified at least three factors that could favor finding a public safety exception:

> First, the questioning without *Miranda* warnings related to an objectively reasonable need to protect the police or the public from any immediate danger. Second, the objective facts did not suggest that the questioning was a subterfuge designed solely to elicit testimonial evidence from a suspect, but instead that the questioning was generally targeted at a safety concern. Finally, the questions were not routinely put to arrested suspects, but rather were supported by an objectively reasonable need to protect against a perceived danger.

*Ferguson*, 702 F.3d at 94 (citing *Estrada*, 430 F.3d at 611-12) (cleaned up).

The *Ferguson* court explicitly expanded the public safety exception beyond questioning during the course of arrest. *Ferguson*, 702 F.3d at 95 ("While Ferguson is correct that prior cases have all considered such situations, the reasoning set forth in those cases applies equally here."). However, in doing so, the *Ferguson* court "recognize[d] that, in certain circumstances, the passage of time between an arrest and an interrogation, among other considerations, may diminish the immediacy of the threat posed by an unaccounted-for firearm" and found that "the immediacy of threats to public safety is highly context-dependent." *Id*. at 95-96.

19

The timeline of events is important here. The Defendant was taken into custody around 8:22 a.m. The first firearm was discovered by 8:40 a.m., and Agents Kirwan and Waithe were made aware of the discovery almost immediately. Agent Pollard testified that he "removed the magazine and made sure there wasn't any rounds in the chamber just to render it safe" before the firearm was placed "right back where [the agent] found it." The agents did not know there were other firearms in the home. At 8:51 a.m., the Defendant was driven away from the scene and transferred to the holding cell in the police station. At 9:14 a.m., Agent Waithe expressed his desire to identify the owner of the firearm for the purpose of assessing any criminal hits on it. Around 9:22 a.m., Agent Waithe instructed Agent Kirwan to speak to the Defendant about the firearm. At 9:26 a.m., approximately 45 minutes after a firearm was discovered, the Defendant was asked about firearms for the first time.

Agent Kirwan entered the interview room, masked, and informed the Defendant that they had found a firearm in plain view and asked him, "My first question is – is there any other firearms in your house, or is that the only one?" Government Exhibit 1, Interview Room footage at 9:26 a.m. The Defendant replied, "There's more." Agent Kirwan then asked, "Are they yours or your girlfriend's?" The Defendant replied, "They're mine." He then offered, not in response to any specific

20

question, that he had obtained them on Snapchat. Agent Kirwan then told the Defendant about the offer to store the firearms as a potential condition of release, which the Defendant declined.

The Court finds that the first question, about the existence of additional firearms at the house, was reasonably necessary to protect the officers who remained at the house with Ms. Arcouette. Agent Waithe and the AUSA he was coordinating with had made the decision to allow Ms. Arcouette to surrender at a later date out of consideration for her need to care for her infants. Agent Waithe and other officers remained at the scene while they finalized the details of her surrender. The officers had already encountered one loaded firearm unsecured on a bookshelf in the living room of the house. And they had decided to allow Ms. Arcouette to remain in the house, including in the living room, without handcuffs or other restraint so that she could tend to her infants. Therefore, it is reasonable for the officers to ensure that there were no other firearms accessible to Ms. Arcouette while the agents finalized the details of her surrender.

It is true that Agent Kirwan's questioning of the Defendant occurred nearly 45 minutes after the first firearm was discovered, and that delay is much of the reason that this issue is a close call. At the time the first firearm was discovered, the Defendant was already in custody in a police vehicle, and it

is unclear why the officers waited 45 minutes to ask him whether there were any others, particularly after Ms. Arcouette reportedly identified the Defendant as the owner of the firearm. However, given the question about the existence of other firearms in the home satisfies the *Estrada* factors and that *Ferguson* allows for limited post-arrest questioning about the location of firearms, the Defendant's response to this question may be admitted.

As a practical matter, Agent Waithe provided Ms. Arcouette with a copy of her warrant including self-surrender instructions around 9:30 a.m., and at that point the officers could have concluded their interactions with Ms. Arcouette and exited the house. Indeed Agent Kirwan stated that the AUSA with whom he was coordinating "is not going to want anything to do with" the first discovered firearm since "it's clean." Defendant's Exhibit A at approximately 9:34:40. That firearm had been unloaded and left in place, on the bookshelf in the room in which Ms. Arcouette was tending to her infants under the watch of officers. However, moments after providing Ms. Arcouette with details of her arraignment, Agent Waithe received a call from Agent Kirwan describing Kirwan's conversation with the Defendant. After learning that the Defendant said there were other firearms in the house, Agent Waithe asked Ms. Arcouette, who had already invoked her *Miranda* rights, whether she knew

22

where they were. Ms. Arcouette offered a couple of potential
locations, prompting the officers to "sweep" those areas and
recover additional firearms and ammunition. Whether those
actions were necessary and appropriate is not a question before
this Court at this time.

The Court finds that Agent Kirwan's continued custodial
interrogation of the Defendant, beyond the initial question
about the existence of additional firearms, may not be admitted.
As discussed above, the existence of additional firearms in the
house may be highly relevant to officer safety, but the
ownership of those same firearms is not. And in contrast with
cases like *Estrada*, *Ferguson*, and *Quarles,* which admitted more
questioning, the officers here were serving a white-collar
arrest warrant, unrelated to any gun crime, and apparently did
not expect to find firearms in the course of their arrest.

The Defendant has presented evidence showing that
establishing firearm ownership was top-of-mind for the officers
for a purpose separate from immediate officer safety
considerations: the officers sought to determine whether the
discovered firearm was illegally owned. Both Agent Waithe and
Agent Kirwan, along with the local police officers on the scene,
discussed potential criminality associated with the firearm.
After discovering the first firearm, the officers quickly began
speculating about whether the Defendant was a prohibited

23

possessor. To establish that offense, they would need to determine ownership of the firearm. In these circumstances, asking the Defendant whether he owned the firearm, while he was in police custody away from the scene, constituted a custodial interrogation of the Defendant which closely resembled an investigative interview rather than limited purpose public safety questioning. Therefore, in the absence of a *Miranda* warning, the remainder of Agent Kirwan's interrogation of the Defendant must be suppressed.

## II.  Statements related to drug use

Approximately 35 minutes after the Defendant admitted to ownership of the firearms, he began experiencing withdrawal symptoms and briefly spit up. Throughout that episode, he was in custody, first shackled to the wall in a police station interview room and later with his hands cuffed to a "belly chain" restraint in a holding room. After he stopped spitting up, he was repeatedly questioned about whether he had taken any illegal substances. This questioning, conducted by a police officer who was aware of a DEA investigation into the Defendant, was a pre-*Miranda* custodial interrogation, and no applicable exception allows for its introduction. Similarly, the Defendant's repetition of his answers to EMTs examining him under the eye of the same police officer must also be suppressed.

24

Both parties have acknowledged that there is "surprisingly sparse" case law that addresses similar situations. ECF No. 19 at 7; *see also* ECF No. 20 at 7. Similar to above, the government has argued first that the police officer's questioning did not constitute an interrogation under *Rhode Island v. Innis,* and in the alternative, that it should be admitted under a "logical corollary of the public safety exception." ECF No. 19 at 7.

For many of the same reasons as the earlier questioning about firearm ownership constituted an interrogation, so does the questioning about drug use. As described above, the police officer conducting the questioning, Lt. Howell, was aware of the DEA investigation into the Defendant. Lt. Howell was also aware that a firearm had been found in the Defendant's home, as he had been in contact with Agent Waithe and had been sent pictures of the firearm to run criminal checks. It is not clear from the record whether Lt. Howell was aware that that the Defendant had confirmed gun ownership 35 minutes prior, but, given Howell's regular contact that morning with Agent Waithe and other officers, it is a safe assumption that he believed the Defendant possessed that firearm. Therefore, any admission by the Defendant that he illegally used a controlled substance would essentially satisfy the elements of 18 U.S.C. § 922(g)(3).

*Rhode Island v. Innis* controls again here. Lt. Howell "should have known" that his questions about drug use "were

25

reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302. An "incriminating response" includes not just "direct confessions" but also "statements which amount to admissions of part or all of an offense." *Id.* at 301 n.5 (quoting *Miranda*, 384 U.S. at 476-77) (internal quotation omitted). Clearly, admission of heroin use meets that bar in this case, and this questioning of the Defendant while he was in custody constituted an interrogation.

Turning to the question of whether an exception applies, the government proposes a "logical corollary" to the public safety exception which could apply when "the defendant himself is the person to be protected by the quick and reactive police action." ECF No. 19 at 7. Logical corollaries like this are known sometimes in state court as the "private safety exception" or the "rescue doctrine," but the Second Circuit does not appear to have established such an exception, if it indeed exists in federal court at all. *See United States v. Sims*, 2025 WL 1090889, at *7, n.4 (E.D. Mich. Apr. 7, 2025) ("Many *state courts* recognize the 'rescue doctrine' as a corollary to the *Quarles* public safety exception that allows police to question a custodial suspect without first providing *Miranda* rights if the primary purpose of the questioning is to locate or protect a potential victim in immediate danger.") (emphasis added); *see also Smith v. State,* 46 So. 3d 608, 609 (Fla. Dist. Ct. App.

2010) ("In such circumstances, where a threat to the safety of
the suspect making the pre-*Miranda* statement is at issue, some
courts recognize a companion exception to the *Quarles* public
safety exception, referred to as a private safety exception or a
rescue doctrine.") However, as the parties acknowledge, there is
"sparse" caselaw at best to support the adoption in this Court
of such a doctrine.

Were the doctrine available in this case, it is still not
clear whether the questioning of the Defendant would qualify.
The record shows that by the time Lt. Howell began questioning
the Defendant, the Defendant had stopped spitting up and was
well enough to return the table in the room to its original
place and use toilet paper to wipe up his spit. Review of the
available video footage does not reveal an individual
experiencing an acute medical crisis which warrants repeated
questioning about drug use while the requested EMTs arrive.
Further undercutting an argument that it was an acute medical
emergency, during the questioning, the Defendant was moved to a
different holding location within the station and his physical
restraints were replaced with a different type. Throughout, the
Defendant was compliant and responsive, and he is ultimately
left alone in a holding cell where the officer continued to
question him through the closed door. All told, the Defendant
was asked about potential drug use approximately 7 different

times, punctuated by various other questions about anything he
may have consumed and a promise that any admission would not be
used to "jam you up." The last round of questions by an officer
which ultimately yielded an admission was conducted while the
officer held a door open for arriving EMTs. Such repeated
custodial interrogation about an element of a crime which
officers were actively investigating may not even qualify for a
private safety exception, should one be available in this Court.

Finally, the government argues that even if the Defendant's
statements to Lt. Howell are inadmissible, his repetition of
those statements to the EMTs should be admitted. To support that
argument, the government cites to *Illinois v. Perkins*, 496 U.S.
292 (1990) which allowed for an undercover officer posing as a
fellow inmate to question a suspect in custody without *Miranda*
warnings. The *Perkins* Court premised that holding on the grounds
that "questioning by captors, who appear to control the
suspect's fate, may create mutually reinforcing pressures that
the Court has assumed will weaken the suspect's will, but where
a suspect does not know that he is conversing with a government
agent, these pressures do not exist." *Id.* at 297. That premise
plainly does not align with this case, where, after the
Defendant admitted to drug use, the officer told him to tell the
EMTs about it. Approximately 15 seconds later the EMTs arrived,
and police officers remained present for the Defendant's

interaction with the EMTs and participated in the conversation.
In these circumstances, the conversation with EMTs while the
Defendant was still in restraints did not suddenly stop being a
custodial interrogation for the purposes of *Miranda,* and a
repeated confession, at the direction of an officer, cannot be
considered voluntary and admissible. The other out-of-circuit
Pennsylvania case and West Virginia state court case cited by
the government are equally distinguishable on the facts from
this one since the individuals in those cases were not in
custody. ECF No. 20 at 8.

The government's position is in essence an argument for a
variation of a two-step interrogation when medical professionals
are involved. The traditionally disfavored two-step involves
interrogating a suspect without an appropriate *Miranda* warning,
obtaining a confession, and then delivering the warning before
re-obtaining the confession. *Missouri v. Seibert*, 542 U.S. 600
(2004) (limiting two-step interrogations). Here, the officer
interrogated the Defendant about his drug use without a *Miranda*
warning, and then, after obtaining a confession, told him to
repeat that confession to EMTs. The interaction with the EMTs
immediately followed the initial confession, and police officers
remained present throughout. In that scenario, it seems unlikely
that the Defendant would have believed that "he could choose to
stop talking even if he had talked earlier[.]" *Seibert*, 542 U.S.

at 612 (plurality opinion). Sanctioning such a practice and allowing repeated statements to medical professionals to "cure" a *Miranda* violation could have significant unintended consequences.

For all of these reasons, the motion to suppress Defendant's statements related to drug use is granted.

## Conclusion

For the reasons above, the Defendant's statement regarding the existence of additional firearms at his home may be admitted, but the remainder of his challenged questioning while in custody prior to receiving a *Miranda* warning may not. Therefore, the Defendant's motion, as clarified in his Supplemental Briefing on Pending Motion to Suppress, ECF No. 24 at 14, is granted in part and denied in part.

DATED at Burlington, in the District of Vermont, this 5th day of June 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge